**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VONETTA CONNER, o/b/o I.C., a minor, | |
| Plaintiff, | |
| v. | No. 11 C 8736<br>Judge James B. Zagel |
| MICHAEL ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

I. The Record Evidence[1]

I.C. was born on July 29, 1996 (T-82). She was 11 years old on September 27, 2007, the date the application was filed, and she was 13 years old at the time of the ALJ decision (T-19). I.C. resides with her biological mother, Vonetta Conner (T-369). I.C. suffers from an Autoimmune Connective Disorder causing alopecia. Alopecia is a medical condition involving the partial or complete loss of hair from the head or body. Psychologically, I.C. also suffers from a learning disability, attention deficit hyperactivity disorder (ADHD), a major depressive disorder, and an anxiety disorder.

A. Medical and School History

    1. 2009 Report of Treating Psychologist Dr. Betsey Hafner Nettleton

On June 23, 2009 (and updated on October 21, 2009), Betsey Hafner Nettleton, Psy.D., completed a Questionnaire for Psychiatric Disorders regarding I.C. (T-449-453). Dr. Nettleton's initial intake was on April 22, 2009 with five individual therapy sessions as of July 2009 (T-49).

---

[1] This recitation of the evidence at the hearing is (with some small deletions) the description offered by counsel for the plaintiff. Having examined the administrative record, I found the description to be fair, accurate and thorough. I have left the transcript identifications intact.

1

Dr. Nettleton diagnosed I.C. as suffering from a Major Depressive Disorder and a Generalized Anxiety Disorder (T-449), as designated by code numbers from the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") as 296.31 (code for Major Depressive Disorder, recurrent, mild) and 300.00 (code for Generalized Anxiety Disorder), American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, (4th ed. rev. 2000).[2] I.C. was also noted to have alopecia, problems at school and problems making friends (T-449). Dr. Nettleton described I.C. as having symptoms of subjective anxiety, agitation, irritability, poor concentration, restlessness, insomnia, tension, headaches and neck pains, excessive guilt, poor self-esteem, and hopelessness (T-449). The doctor further indicated that I.C. had a dysphoric mood, depressed affect, and noted that I.C. was prescribed Prozac on June 10, 2009 (T-449). Dr. Nettleton indicated that if through therapy I.C. could come to terms with her alopecia (which worsens with anxiety and depression) and follows medication management, she might possibly return to a healthier level of functioning (T-450). Nevertheless, the doctor cautioned that "of course, arrival / commencement of Major Depression at a young age can be indicative of future depressive episodes" (T-450). Dr. Nettleton noted that I.C. had a moderate limitation in the realm of acquiring and using information, a marked limitation in the
realm of attending and completing tasks (T-450-451), and a marked limitation in the realm of interacting and relating with others (T-451). Dr. Nettleton indicated that I.C. had mild limitations in caring for herself (T-452). The health and physical well-being domain was ultimately deemed not ratable on available information with I.C. needing this to be assessed by her primary care physician (T-452). In the 'additional comments' section, therapy thus far for I.C. was noted as having been psycho educational and that future sessions would focus on coping skills and other

---

[2] DSM-V has been approved by the psychiatric profession but nothing in the revision is claimed here to have altered or affected the analysis of Plaintiff's mental state.

cognitive behavioral interventions (T-452). On October 21, 2009, Dr. Nettleton wrote that since completing the questionnaire in June, she had administered the Conners 3 test (a title unrelated to the plaintiff's surname) to obtain more information about I.C.'s limitations regarding attending and completing tasks (T-453). Dr. Nettleton explained that the Conners 3 was a testing instrument used to measure attention and concentration, especially as it may relate to ADHD symptoms (T-453). Test results suggested problems with attention and concentration (T-453). Dr. Nettleton indicated that these difficulties may stem from anxiety and/or depression and/or ADHD (T-453). Dr. Nettleton highlighted that it was these test results which led her to change the rating on the "Questionnaire for Psychiatric Disorders" regarding "attending and completing tasks" from "moderate" to "marked" (T-453). In addition, Dr. Nettleton indicated that she had also changed the answer to the health and well-being question to "not ratable on available information" from moderate, out of the belief that this particular question would be best answered by a physician (T-453).

    2. Age 12 to Age 13 (February 2009 to October 2009)

On February 11, 2009, school correspondence indicated I.C. was having difficulty with failing marks due to missing and incomplete homework (T-424). On March 17, 2009, Rachel Jennings, Counselor, wrote a letter indicating that I.C. failed two or more classes and that retention in the present grade level was strongly considered (T-433). In order for I.C. to advance to the next grade, a "SIGNIFICANT" improvement in her grades would be needed (T-433). On April 16, 2009, Ms. Jennings noted that I.C. would benefit from a Mental Health In-School Therapy Program (T-435-438). On May 11, 2009, Rachel Jennings and the "All Star Team" of teachers at Highland Middle School completed a Teacher Questionnaire (T-440-445). The questionnaire indicated I.C. was in seventh grade, but had a current reading level of a fifth-sixth

grader and the math level of a fifth grader (T-440). The questionnaire indicated that I.C. attended special education services one hour a week in math, and also attended a remedial reading skills class (T-440). The questionnaire also indicated that I.C. was frequently absent from school and that I.C. had problems functioning in the domain of attending and completing tasks. I.C. had the following "obvious problems" that affected her daily: focusing long enough to complete an assigned task, refocusing to task when necessary, waiting to take turns, organizing her own things or school materials, completing assignments, and working without distractions (T-440-442). The questionnaire further indicated that I.C. had problems functioning in the domain of interacting and relating with others and that she had very serious problems that occurred daily of playing cooperatively with others, making and keeping friends, and relating experiences and telling stories (T-443). It further noted that she had obvious problems that occurred on a daily basis with seeking attention properly, properly expressing anger, waiting to take turns, taking turns in a conversation, and interpreting meaning of body language (T-443). The questionnaire indicated that I.C. experienced physical effects related to her alopecia on a daily basis and had poor peer relations as a result (T-444). The questionnaire noted that "I.C. refuses to tell the other students the truth about her medical condition," and that she "makes up stories and lies about not having hair." (T-444). The questionnaire further indicated that I.C. had very poor social skills, did not accept her disability and made up stories and that she felt as though she had no friends (T-445).

    3. <u>Age 10 to Age 12 (March 2007 to October 2008)</u>

On April 28, 2008, a questionnaire completed by one of I.C.'s teachers noted that I.C. had alopecia and that I.C. was very sensitive about her hair and that she would cry when put in an uncomfortable situation (T-238-245). While in the 5th grade, a Special Education

Cooperative Diagnostic Interview dated March 16, 2007, reflects the teacher's view that I.C. had not been doing her homework, talked at inappropriate times during class, was out of her seat at inappropriate times, was not an independent worker and possibly had an ability problem (T-296, 380). On April 23, 2007, an Individualized Education Program ("IEP") was performed. The report indicated that I.C. had average cognitive ability. The report reflects concern that I.C. had a "personality conflict with her teacher" (T-299, 383). The report reflects I.C.'s poor attention, poor independence and poor work completion. Excessive talking and out of seat behavior was also noted as negatively impacting learning and practice opportunities (T-299, 383). The report further indicates I.C was suffering from alopecia/stress related loss of body hair and that I.C. may be negatively reacting to stress. I.C. had twice lost all of her body hair due to stress pertaining to witnessing domestic abuse and her parents' volatile divorce (T-302, 386). This section also indicates that children at school had taken her wig off her head as a "joke" at least two times, and these instances have had a lasting effect on I.C. emotionally (T-302, 386). The report also emphasized that I.C. rarely turns in homework, does not work well independently and constantly disrupts the classroom by talking and getting out of her seat (T-302, 386). Other records indicated that on April 18, 2007, a teacher observed I.C. in a social studies classroom. noting that I.C. could not do her work on her own, and was disruptive (T-306, 360). As part of the IEP, the teachers were asked to assess I.C.'s social behavior and emotional skills. Teacher Casteel rated I.C. in the Clinically Significant Range for Cognitive Problems/Inattention and also to be at risk for ADHD (T-304, 359). Teacher Czazsty rated I.C. in the Clinically Significant Range for being Oppositional, for Cognitive Problems/Inattention, for Hyperactivity, and for ADHD (T-304, 359). The teachers stated that I.C. did not complete assignments, had difficulty following directions, did not work independently, daydreamed, forgot needed materials,

disrupted the class, bothered other students, and rarely did homework (T-304, 359). Out of seat behaviors were noted as well as talking often and at inappropriate times (T-304, 359). Based on the evaluation and review of I.C.'s record, it was determined that I.C. had a learning disability and needed special education (T-307, 361). A report card dated June 2007 indicated that I.C. received an "F" in five of her classes and had not completed all of the work required for those grading periods (T-392-395). On October 18, 2007, I.C.'s sixth grade teacher completed a Teacher Questionnaire (T-172-183). The teacher noted that even though I.C. was in sixth grade, her reading and math levels were at a fourth – fifth grade level and her written language level was at a fourth grade level (T-176).

     4. <u>Age 8 To Age 9 (March 2005 to February 2006)</u>

On March 18, 2005, I.C. visited her pediatrician due to hair loss (T-351). The pediatrician's notes document hair loss since September of 2003 (T-351). On April 19, 2005, she again visited her pediatrician because her hair loss was getting worse (T-351). At that time, I.C. was diagnosed with alopecia (T-351). The Pediatric Symptom Checklist, completed by I.C.'s mother, reported that I.C. often tired easily and had little energy, was fidgety and unable to sit still, daydreamed too much, was afraid of new situations, often felt unhappy, angry, and hopeless, often had trouble concentrating, was down on herself, had trouble sleeping and worried often (T-350). On January 16, 2006, Dr. Zuhair Alsakaji received a Clinical Pathology Consultation Report which indicated that I.C.'s ANA screen was positive with a titer of 1:1280 and a speckled staining pattern (T-341). The report further indicated that these results were suggestive of Systemic Lupus Erythematosus, Scleroderma, Connective Tissue disease, and other auto-immune diseases (T-341). In February of 2006, Dr. Tarek Kudaimi indicated that given I.C.'s highly positive ANA she needed to be watched for Lupus (T-338). The doctor

recommended avenues for a local hair growth dermatology consultation (T-338).

     5. <u>Vonetta Conner's Testimony and I.C's Testimony</u>

     On February 23, 2010, the ALJ received testimony from I.C. and her mother (T-35-70). Ms. Conner testified that her daughter, I.C., has no hair in her eyebrow area and head area (T-67). I.C. only testified briefly and she indicated that she stopped liking school in third grade when someone pulled off her wig and nobody wanted to talk to her (T-68). She further testified that she was failing classes because sometimes she loses focus and does not do her homework (T-69). She cries because she feels like nobody wants to hang out with her (T-70). Ms. Conner testified that I.C. sees counselors weekly both at school and also outside of school (T-40). I.C. has also seen her doctor, dermatologist and psychiatrist for hair loss and depression (T-41). The psychiatrist prescribed medications to calm I.C. down because "she wasn't staying focused, more or less, kind of hyper, jittery, couldn't sit still" and she was having trouble sleeping (T-41, 42). I.C. received injections for her hair loss from 2006 to 2008, but then stopped because they were very painful and not successful (T-42-43). Ms. Conner testified that at the time of hearing, I.C. was getting 4 Ds and 2 Cs and that the teacher stated I.C.'s poor performance was due to "social" and "attention" problems (T-46-47). I.C. was scared her wig would fall off and the kids would tease her (T-46-47). I.C. tries to talk to other kids, but they do not respond in a positive way (T-47). Ms. Conner related that some of the kids at school say they might catch what I.C. has or that she has cancer; when this occurred I.C. would come home crying (T-47, 48). Ms. Conner testified that at home I.C. gets upset and does not talk to her "because she had a bad day at school" and further indicated that I.C. is different from her siblings in that, "she will kind of stay off to herself, close the door, doesn't really want to come out" and that she does not understand why the other kids won't play with her (T-48, 50). Ms. Conner testified that I.C. has

7

a problem with her nails, like her hair, and sometimes her nails fall off (T-52). I.C. will try and figure out ways to cover her nails, such as with a bandage (T-52). Ms. Conner testified that I.C. complains about joint and muscle pain and that the doctor wants to keep an eye on her because he was concerned about possible Lupus (T-53). Sometimes I.C. uses crutches when she is having pains and sometimes she misses school due to the pain (T-53, 54). At times, Ms. Conner helps I.C. get dressed due to I.C.'s muscle aches. Other times, I.C. is not motivated to go to school because she is afraid of what is going to happen (T-55, 56). Ms. Conner further testified about an incident where I.C. tried to run out of the school (T-59, 60). At the time of the hearing, I.C. was getting 4 Ds because she had problems focusing (T-60). Ms. Conner also testified that I.C. had crying spells quite frequently about seeing other kids play outside or relative to fears about her father who had been abusive to Ms. Conner in the past (T-60-62). I.C. isolates herself in her room every day and has no friends (T-62-63, 67). She gives up easily and she gets sidetracked (T-63, 64). I.C. has rashes on her face, neck, chest and back and she uses Triamcinolone and Codometrozone, a topical cream (T-64, 65).

      6. State Agency Consultant and Social Security Consultant Reports

      On June 3, 2008, state agency psychological and medical consultants, William A. Shipley, Ph.D., and P. Kelley, M.D. indicated I.C.'s impairments were severe but did not meet, medically equal, or functionally equal the listings (T-417). On October 28, 2008, Social Security consultant Lawrence Hagerman, M.D., completed a medical interrogatory and opined that I.C.'s medically determined impairments cause more than a minimal limitation in I.C.'s ability to function and that I.C.'s hair loss condition had caused a depressed mood and interfered with normal peer relationships (T-426). He noted she is teased and very sensitive about this condition (T-426). He further noted that I.C. had a learning disability requiring an IEP and that she is

8

behind her peers in math and reading (T-426). Dr. Hagerman opined that I.C.'s impairments caused more than a minimal limitation in her ability to function but found that these impairments did not meet or medically equal the requirements of any listings (T-426, 428). On November 12, 2007, I.C. was seen by Gregory Rudolph, Ph.D. for a psychological consultative examination (T-368). Dr. Rudolph diagnosed I.C. with Adjustment Disorder with Depressed Mood Level, Learning Disability, alopecia, and a Connective Tissue Disorder (T-368). Her present mood level reflected some mild depression, and the reports indicate that I.C. was experiencing an adjustment disorder with some depressed mood "as a result of the pressures she is experiencing at school." (T-370). On November 29, 2007, state agency psychological and medical consultants Dr. Kenneth Neville, Ph.D. and Dr. Steven Roush, M.D., completed an initial Childhood Disability Evaluation Form (T-373-378). The consultants indicated that I.C.'s impairments included a learning disability and an adjustment disorder with depressive mood and that such impairments were severe but did not meet, medically equal, or functionally equal the listings (T-373). The state agency consultants did not see I.C. prior to their completion of their various reports based on a comprehensive examination of school and medical records.

      7. The ALJ's Decision

      The ALJ found I.C. to have two severe impairments: attention deficit hyperactivity disorder ("ADHD"), and a learning disorder (T-19) and concluded that I.C. did not meet Listing 112.11 for Attention Deficit Hyperactivity Disorder and/or Listing 112.02 for Organic Mental Disorders (T-19). In terms of the six functional equivalence domains, the ALJ found the following regarding limitations caused by I.C.'s impairments: I.C. has less than marked limitations in acquiring and using information (T-25); I.C. has no limitation in attending and completing tasks (T-26); I.C. has no limitation in interacting and relating with others (T-27); I.C.

has no limitation in moving about and manipulating objects (T-28); I.C. has no limitation in the ability to care for herself (T-29); and I.C. has less than marked limitation in health and physical well-being (T-30).

II. The Legal Analysis

The Commissioner's decision must be supported by substantial evidence (meaning enough evidence for a reasonable mind to accept as adequate to support a conclusion) and expressed in language that permits informed review. *Garfield v. Schweiker,* 732 F.2d 605 (7th Cir. 1984). If there is, in the abstract sense, the required substantial evidence, the Commissioner's decision may yet be overturned if contrary evidence is overlooked or the analysis fails to build "a logical bridge between the facts of the case and the outcome." *Parker v. Astrue,* 597 F.3d 920 (7th Cir. 2010).

Disability in children arises from physical or mental impairments that leave the child with marked and severe functional limitations for a continuous period of 12 months or more. With children, impairments are judged in light of the child's health and physical well-being and the child's ability to acquire and use information, attending and completing tasks, interacting and relating with others, movement and manipulation of objects and caring for oneself. The ALJ found severe impairments of attention deficit hyperactivity disorder and learning disorder. I.C. did not, he found, meet the appropriate listings with respect to these conditions. He found I.C. did not have marked limitations in acquiring and using information and had no limitation in any of the other function categories. There was a less than marked limitation in health and physical well-being.

Of the professionals who studied I.C.'s status, only one of them spent time with her. It is true that no one with an M.D. or D.O. opined on functional abilities, but the professional who did

10

deal with the child was a Psy.D. and was qualified to render expert opinion. Dr. Nettleton's conclusion after two encounters concluded that there were marked impairments in attending and completing tasks and in interacting and relating with others. She also diagnosed Major Depressive Disorder and Anxiety Disorder. There are other experts, none of whom found marked impairments but none of them reached their conclusion on any evidence other than written reports of tests and of the child's conduct. There is a general rule giving weight to the conclusions of those who have encountered and treated the child. The general rule can be overcome, but the decision of the ALJ to do so requires a detailed explanation why this is so.

The reason given here by the ALJ was his view that Dr. Nettleton's opinions were conclusions without evidentiary support. This opinion cannot stand on this record when this expert had administered additional testing on a second examination and relied on this and earlier testing. There is other evidence which supports Dr. Nettleton's opinion that is found in reports from school personnel, both counselors and teachers.

This case is clearly one in which a decision requires a careful balancing of and attention to the details of the characteristics of the child and the effect of these characteristics. This child has alopecia and is, understandably, troubled by the fact that she is "different" from others of her age and must endure the mocking and cruelty of other children. Social integration with her peers is difficult for her and so too is her ability to get support from her peers. She does not tell her peers about her medical condition and "makes up stories and lies about not having hair." Moreover she has other problems, apart from alopecia.

Her teachers noted her inability to focus on a task for the time it takes to complete it, to wait for taking turns with other children, organizing her things and school materials and other failures of attention. She has trouble playing cooperatively, making or keeping friends, and

11

telling false tales. Her ways of seeking attention, expressing anger and interpreting body language are subpar. All of this is noted in the files of school personnel who were part of a program effort to analyze the child's problems.

The opinion of Dr. Nettleton has significant support in the school records. This does not mean that the ALJ reached the wrong result. It is my view that he went about reaching his result in a legally insufficient way.

One could look at the written reports in this case and reach a different conclusion[3] than Dr. Nettleton, but Nettleton saw the child, tested the child and observed the child and did so more than once. In addition to this, Nettleton had more recent data than the non-examining experts who relied on records that were prepared in 2008. Nettleton had about a year's worth of more recent records. The older the record the less confidence one can have in the relevance and validity they have in diagnoses of current conditions. See *Jelinek v. Astrue,* 662 F.3d 805 (7th Cir. 2011). This, I think, must be especially true with respect to considering childhood disability.

Here, the ALJ clearly should have appointed a medical expert to assist the ALJ; here, a psychiatrist or psychologist, with some professional experience with children who are troubled as this child was, would be of essential assistance to the ALJ in correctly determining the level of disability on the basis of an integrated view of the "whole child" as the regulations require. If possible, such an appointed expert would benefit from his or her examination of the child rather than an examination of the files. This is a troubling case to consider, not because one side or the other is clearly correct and a bad decision was made, but rather the case presents difficulties that

---

[3] I do not find that the other experts who evaluated the child's condition are any less conclusory in their opinions than Dr. Nettleton. Nor do I find that none of the other expert's reports offered any support to Nettleton's views, Dr. Rudolph did offer some support.

12

require a far more careful evaluation than that which occurred here. [4] Plaintiff's motion for summary judgment [13] is granted in part and denied in part. Defendant's motion for summary judgment [18] is denied. This case is remanded to the Commissioner for further evaluation and consideration under sentence four of 42 U.S.C. § 405(g).

ENTER:

James B. Zagel
United States District Judge

DATE: December 27, 2012

---

[4] (a)The plaintiff notes, correctly, that the Commissioner does not respond and thus does not contradict the claim that the ALJ did not consider a connective tissue disorder and alopecia as impairments,(b) the plaintiff is correct that the Commissioner cannot defend the ALJ by urging that "the record indicates that Dr. Nettleton's assessment may have been influenced by a desire to help I.C. obtain disability benefits" when the ALJ did not so find, and (c) the plaintiff argues that the ALJ's rejection of the mother's testimony is unreasonable, but I am unwilling to accept either side's view of credibility; neither inconsistency nor consistency is a definitive test of truthfulness; demeanor which cannot be put on the record is an unknown factor, and the correctness of judgments of demeanor can rarely be effectively determined on review.